CITY OF OTTUMWA, IOWA, v. CITY WATER SUPPLY CO.

(Circuit Court of Appeals, Eighth Circuit. November 26, 1902.)

Nos. 1,658, 1,712.

1. JURISDICTION OF FEDERAL COURTS—AMOUNT IN DISPUTE—SUIT BY TAXPAYER FOR INJUNCTION.

In a suit by a taxpayer to enjoin a city from issuing bonds claimed to be in excess of the constitutional limit of its indebtedness, the power of the city to issue such bonds is the matter in dispute for the purpose of determining whether the amount or value in controversy is sufficient to give a federal court jurisdiction, and not the tax to which complainant would be subjected.

2. SAME—FOLLOWING STATE DECISION—APPLICATION OF LOCAL LAWS.

While the federal courts are bound by the construction placed by the highest court of a state on a state statute or constitutional provision, when it becomes necessary to apply the statute or provision, as thus construed by the local courts, to a particular contract, and to determine from a consideration of all its provisions whether it is a violation of the law, a federal court is entitled to express an independent judgment.

8. MUNICIPAL CORPORATIONS—LIMITATION ON POWER TO CREATE INDEBTEDNESS—IOWA CONSTITUTION.

The constitution of Iowa provides (article 11, § 3) that "no county or other political or municipal corporation shall be allowed to become indebted in any manner or for any purpose to an amount in the aggregate

¶ 1. Jurisdiction of circuit courts as determined by amount in controversy, see notes to Auer v. Lombard, 19 C. C. A. 75; Shoe Co. v. Roper, 36 C. C. A. 459.

¶ 2. State laws as rules of decision in federal courts, see notes to Railway Co. v. Ziegler, 9 C. C. A. 548; Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.

¶ 3. Constitutional and statutory limitations of municipal indebtedness, see note to City of Helena v. Mills, 36 C. C. A. 6.

exceeding five per centum on the value of the taxable property within such county or corporation, to be ascertained by the last state and county tax lists previous to the incurring of such indebtedness." The city of Ottumwa, which was at the time indebted to an amount beyond such limit, passed an ordinance authorizing the issuance of nearly $400,000 in negotiable bonds to be sold by the city, and the proceeds used in the construction of a waterworks plant to be owned by the city, and such action was subsequently approved by a vote of the electors. The bonds were to be payable at stated times, to bear interest payable semiannually, and to be secured by a mortgage on the water plant. The ordinance also levied a sinking fund tax of two mills for the current year and every year thereafter until the cost of the plant should be fully paid, and pledged the proceeds of such tax to the payment of the principal and interest of the bonds. It further provided that there should be levied every year after the construction of the waterworks a water tax of 5 mills, or so much thereof as might be necessary, together with the net proceeds of the water rents, to pay the cost of maintenance, etc., "and to pay any of the purchase price or cost of constructing said works, or bonds or mortgages issued therefor, or interest thereon, which shall not be paid from the proceeds of the two mill tax provided for in section 2 thereof." Any surplus arising from such water tax or water rentals was pledged to the payment of the bonds, and it was provided that no part of the same, principal or interest, should be paid out of any fund, levy, or tax other than those so provided. *Held*, that such bonds would create an indebtedness of the city within the meaning of the constitutional provision, and that the city was without power to issue the same; that the plain purpose of such provision was to restrict the power of the legislature to authorize, and of municipalities to create, obligations "in any manner or for any purpose" in excess of the limit imposed, which must be paid by taxation, and that it could not be evaded by the previous levy of a continuing tax, and by providing that the obligation should be paid only from its proceeds, even if such limitation was absolute, as was not the case with the bonds in question, under which the holders would have the additional right to compel the levy of the water tax to the full limit from year to year for their benefit, if necessary to meet maturing payments, so long as any of the bonds were unpaid.

Appeals from the Circuit Court of the United States for the Southern District of Iowa.

By Ordinance 566, passed by the city council of the city of Ottumwa August 21, 1899, it was provided and ordained that the city of Ottumwa accepts and elects to exercise the powers granted it by chapter 5 of the Code of Iowa of 1897, as amended, and to acquire by purchase or erection a system of waterworks for supplying the city and its inhabitants with water. To create a sinking fund for such purchase or erection, there was levied by said ordinance for the year 1899, and every year thereafter until the purchase or contract price for the waterworks should be fully paid, a tax of two mills on the dollar on all property within the corporate limits of the city, except lots greater than 10 acres, used for horticultural or agricultural purposes; the proceeds of such tax levy to be used exclusively to pay the purchase price or cost of such waterworks and any bonds, mortgages, or other obligations issued therefor, with interest; also that there should be levied every year on all taxable property within the limits of benefit and protection of the waterworks a water tax of five mills on the dollar, or so much as should be necessary, together with the net proceeds of water rents collected from consumers, to pay the cost of maintenance, operation, repairs, extensions, and improvements, and any of the purchase price or cost of construction, or bonds or mortgages issued therefor, or interest thereon, not paid from the proceeds of said two-mill tax. The ordinance, after some provisions for an effort to purchase the waterworks of the appellee, which need not be further noticed, provided that, if such effort failed, the city council should cause plans and specifications for waterworks to be prepared, advertise for bids, and contract

with the lowest bidder; the contract to be subject to the approval of the electors of said city at a special election to be called. By an amendment to said ordinance, passed February 4, 1901, it was provided that, to create a special fund to pay the cost of erecting the contemplated waterworks in case the electors of the city should approve the contract for such erection, a sufficient number of bonds, enough, with the sinking fund on hand, to pay the contract price for the waterworks and connected expenses, should be issued in denominations not less than $100 nor more than $1,000, bearing semiannual interest not more than 4½ per cent., and payable $5,000 two years from their date and $5,000 at the end of each year thereafter for 22 years, and then not less than $10,000 per year not exceeding 50 years from their date, such payment to be secured by a mortgage on the system of waterworks, and that to such payment should be pledged the entire proceeds of the two-mill sinking fund tax and so much of the water rates and rentals from consumers and of said water tax as might not be needed for maintenance, operation, repairs, extensions, and improvements; that said bonds should be sold for not less than par, and the money received therefor be held by said city as a special and trust fund to pay for the construction and completion of the waterworks; that the contract for the erection of the works should provide for payment out of said funds only; and that the city should assume no other obligation than that of negotiating and selling said bonds and holding said fund for the purpose of paying for said plant, and that the fund should be devoted to no other purpose; the bonds to be sold before the erection was begun, or during the progress of the work to pay monthly estimates, or turned over to the contractor to pay as the work progressed, should the city so contract. On March 30, 1901, in accordance with a bid accepted by said city council, said city, through its proper officers, entered into a written contract with the Fruin-Bambrick Construction Company for the construction by that company of such waterworks in accordance with plans and specifications mentioned for the sum of $398,991; the work to be begun within 60 days after the ratification and approval of the contract by the electors of said city at a special election to be called, or as soon thereafter as the city should succeed in negotiating and selling its bonds for the purpose of creating a trust fund; the work to be completed by June 25, 1902. Thereupon the appellee, a corporation of the state of Maine, filed its bill of complaint in the circuit court of the United States for the Southern district of Iowa, alleging that complainant owned a large amount of real estate and personal property in said city on which was expended more than $500,000, and which was mainly devoted to supplying said city and its citizens with water, under franchises derived from said city, and is a large taxpayer of said city, and that its annual tax charge and payment equals and exceeds $2,000. That the Iowa constitution provides that no municipal corporation shall be allowed to become indebted in any manner or for any purpose to an amount in the aggregate exceeding 5 per centum on the value of the taxable property within such corporation, as ascertained by the last state and county tax lists previous to the incurring of such indebtedness; and that the valuation of the taxable property within said city as ascertained by the last state and county tax list made for the year 1900 was $2,394,890. That the limit of indebtedness it could incur lawfully was $119,744.51, and that on the 30th and 31st days of March, 1901, it was already indebted more than $123,000. That a special election to ratify and approve said contract for the erection of waterworks had been called; and that such contract, if entered into and carried out, would increase the then existing indebtedness of said city $400,000. That the matter in dispute in the suit exceeded $2,000, exclusive of interest. And complainant prayed for decree enjoining the holding of the special election and the issuing of any bonds in accordance with said ordinances and contract, and for other relief, including a similar injunction pendente lite. The defendant city took issue by demurrer and plea to the allegations of the bill that the matter in dispute in the suit exceeds $2,000, exclusive of interest. Its answer, also filed, in effect admitted all the other facts above recited, and the allegations of the bill above stated, as to the existing indebtedness of the city and the value of the taxable property within the city as shown by the last state and county tax lists. Upon full hearing July 31, 1901, the

court ordered the temporary injunction as prayed, except that the proposed special election was not enjoined, and from this order the defendant appealed to this court. Afterwards, on November 25, 1901, upon leave of the court duly obtained, the complainant filed its supplemental bill in said cause, reciting the original bill and proceedings thereunder, and that at a special election held in said city September 7, 1901, the canvass of the votes showed that said contract between said city and the Fruin-Bambrick Construction Company was approved by the electors, and that said city threatened and was about to carry out said contract and incur indebtedness in excess of the constitutional limit; and upon said supplemental bill, and the answer of the city thereto, and further showing, the court, on December 21, 1901, ordered a further temporary injunction, enjoining and restraining said city and its officers from issuing or causing to be issued, executed, or negotiated any bonds or other obligations of said city pursuant to said ordinances, and from doing any act under said contract with said Fruin-Bambrick Construction Company. From this order the second appeal to this court is taken. Pursuant to stipulation, the two appeals were consolidated and heard together in this court.

W. H. C. Jaques (Geo. F. Heindel and J. R. Jaques, on the brief), for appellant.

Wm. McNett and Wm. A. Underwood, for appellee.

Before SANBORN and THAYER, Circuit Judges, and LOCHREN, District Judge.

LOCHREN, District Judge, after stating the case as above, delivered the opinion of the court.

1. The amount in dispute in this suit, if only measured by the injury to the complainant from the increased taxation of its property in the city of Ottumwa necessary to provide for the payment of bonds proposed to be issued for the construction of the new waterworks, was more than sufficient to sustain the jurisdiction of the circuit court. Whether we consider the proportion of the $398,991—the cost of the proposed waterworks—which would rest on the complainant's property as part of the taxable property of the city, or the two-mill tax thereon during the period of 50 years provided for, the burden or incumbrance which would be made to rest on the property of complainant would considerably exceed the sum of $2,000.

But the city of Ottumwa was about to enter into the proposed contract for the erection of waterworks, and issue and negotiate bonds of the city as proposed to the amount of $398,900 to procure money to pay for the same. Complainant contends that the city, being already indebted beyond the constitutional limit, has no right or power to enter into such contract or issue such bonds. Whether it has or has not such power to issue and negotiate that large amount of bonds is certainly the matter in dispute in this suit, brought to restrain and prohibit the city from taking such action. Johnston v. City of Pittsburg (C. C.) 106 Fed. 753; Rainey v. Herbert, 5 C. C. A. 183, 55 Fed. 443; Market Co. v. Hoffman, 101 U. S. 112, 25 L. Ed. 782; Railroad Co. v. Ward, 2 Black, 485, 17 L. Ed. 311; Stinson v. Dousman, 20 How. 461, 15 L. Ed. 966; Scott v. Donald, 165 U. S. 107, 114, 17 Sup. Ct. 262, 41 L. Ed. 648.

2. Section 3 of article 11 of the constitution of Iowa is as follows:

"No county or other political or municipal corporation shall be allowed to become indebted in any manner, or for any purpose to an amount in the

aggregate exceeding five per centum on the value of the taxable property within such county or corporation, to be ascertained by the last state and county tax lists previous to the incurring of such indebtedness."

The language of this section is plain and simple, and its meaning is unmistakable. The incurring of indebtedness beyond the amount limited is absolutely and unqualifiedly prohibited, no matter what the pretext or circumstances, or the form which the indebtedness is made to assume. It curbs equally the power of the legislature, the officials, and the people themselves; and was designed to protect the taxpayers from the folly and improvidence of either, or of all combined. When the ordinances referred to in the foregoing statement were passed, and the contract for the erection of the waterworks entered into subject to the approval of the voters, which approval has since been had, it is admitted that the city of Ottumwa was, and still remains, indebted beyond its constitutional limit, and that it could not and cannot incur any further indebtedness "in any manner or for any purpose." Under these ordinances and that approved contract, the city now proposes to issue and sell at par its bonds to the amount of $398,900, bearing interest at 4½ per cent., payable semi-annually, the principal payable at stated times, as above mentioned; and with the money obtained by the city from the sale of such bonds to cause to be constructed under said contract the projected system of waterworks, to be owned by the city when constructed. The scheme thus stated, in its principal features, without considering the details which are claimed to have the effect of wholly changing its character, plainly involves the incurring of indebtedness by the city to the amount of the bonds. The bonds are obligations of the city to pay the amounts thereof to the holders as the bonds and coupons shall mature. The city is to sell the bonds at par, and use the proceeds for the construction of its own waterworks plant, constructed for its municipal uses and purposes. The city, therefore, by the transaction, will borrow the money from the purchasers of the bonds, obligate itself to repay it according to the terms of the bonds, and invest the money thus borrowed in property to be owned by it and used for a municipal purpose.

But it is contended by the appellant that no indebtedness on the part of the city will be incurred by the issuing and negotiation of such bonds and construction of such waterworks, because in the ordinances referred to for the purpose of creating a sinking fund to be used in the erection of a system of waterworks there is levied for the year 1899 and each year thereafter till the cost of the waterworks is fully paid a tax of two mills on the dollar upon all property within the limits of the city, except lots greater than 10 acres, used for horticultural or agricultural purposes. The proceeds of such tax are to be used exclusively to pay the cost of construction of such waterworks and any bonds, mortgages, or other obligations issued to pay such cost and the interest thereon. And, further, that there shall be levied each year on all taxable property lying within the limits of benefit and protection of the waterworks, after its construction, a water tax of five mills on the dollar, or so much thereof as may be necessary, together with the net proceeds of water rents collected, to pay the

cost of maintenance, repair, and operation of the waterworks and extensions and improvements, "and to pay any of the purchase price or cost of constructing said works, or of any bonds or mortgages issued therefor, or interest thereon, which shall not be paid from the proceeds of the two-mill tax." It was also provided that the payment of the bonds and the interest thereon shall be secured by a mortgage on the system of waterworks, and to the payment thereof shall be pledged the entire proceeds of the two-mill sinking fund, and so much of the proceeds of the water rates and rentals and of said five-mill water tax as may not be needed for the maintenance, repairs, operation, extension, and improvement of the waterworks. Said ordinances further provide that no part of the cost of said waterworks, or any of the bonds issued therefor, shall ever be paid out of the general funds of said city, or out of any fund or the proceeds of any tax other than the property and funds specifically named, and that such provision and limitation shall be recited in the bonds; and hence it is argued that the transaction will not create any indebtedness on the part of the city, but that the money borrowed by the city from the purchasers of the bonds will be only an anticipation by the city, for its present use, of specific revenues which it has provided for, to accrue in the future. This contention of the appellant is based upon a palpable jugglery of phrases, and cannot be maintained. If it can, the constitutional provision above quoted, which prohibits any municipality from becoming indebted beyond the specified limit "in any manner or for any purpose" is delusive, and of no avail to protect taxpayers. Here the city of Ottumwa is admittedly indebted beyond the constitutional limit. It is conceded that legislative sanction is powerless to authorize it to increase its indebtedness. It proposes to issue and sell at par its bonds to the amount of nearly $400,000 to raise money to construct waterworks to be owned by the city. The bonds are to be formal obligations of the city to pay the interest and principal, as the same shall mature, from moneys to be raised and collected by taxes levied on the taxable property of the city. The mixing of water rent surplus with the "sinking fund" means nothing, as, in addition to the water rents, an annual tax of five mills is agreed to be levied yearly to provide the annual current expenses of operating the waterworks. The city has no revenue, nor means of raising money, except by levy of taxes. It is admitted that if the scheme contemplated the payment of the bonds only from a two-mill tax, which was agreed to be levied year by year for their payment, an indebtedness of the city would be created; but it is contended that by making one levy now of an annual two-mill tax, to be collected of the taxpayers year by year for 50 years, or till the bonds are paid, and from which fund only they are to be paid, no indebtedness is created, and that the borrowing of the money for which the bonds are negotiated is but a simple method of anticipating for present use the future revenue, which will come from the tax so levied covering the future years. We think the taxpayer in future years will regard this scheme as a subterfuge to deprive him of the protection of the constitution, and that the thought will force itself upon him that a city creates an indebtedness when it borrows money to be paid, with

interest, from taxes in the future, whether such taxes are formally levied at one time, covering that future, or yearly, to meet the payments when about to mature.

The creation of an indebtedness by an individual is often effected by borrowing money for his present uses, and always in anticipation of his future revenues and resources, whether he has a reliable source of revenue or it is only uncertain and hoped for. If he has a reliable fixed income in property rentals, for example, and agrees with the lender that he will devote and set apart and apply in satisfaction of the loan all the rents—already fixed in amount—which he will receive and collect from a specified building or estate, yearly, as he shall collect the same, and the lender agrees to be content with that arrangement, and that he will not seek to otherwise recover the sum loaned, is it not clear that the borrower is indebted to the lender until the loan is satisfied by payment? The rents agreed to be applied are owing by the tenants to the borrower. When paid by the tenants, the money belongs to their landlord, the borrower, and never belongs to the lender until paid over to him by the borrower; and then, and not before, it is applied to the satisfaction of the loan. If the borrower should, after receiving such rents, fail to pay the same to the lender, the latter would become released from his agreement to wait for the rents, and could proceed against his debtor generally. This supposed case is precisely analogous to the scheme of the city of Ottumwa which we are considering. If the proposed bonds are issued and negotiated, the city will borrow from each bond purchaser the amount he pays for the bonds so purchased. The bonds constitute and embody the agreement and obligation of the city to pay the sums so borrowed and interest, but only from the collections of a particular tax which it has levied once for all, covering the future, year by year, and which it obligates itself to collect, year by year, and apply to the payment and satisfaction of the interest and principal of the bonds. The bondholders have no interest in or dominion over this tax so levied, and cannot collect it, or in any way coerce the taxpayers. The city alone can collect such tax, with its other taxes. When paid by the taxpayers, the money goes into the treasury of the city, and belongs to the city, like all other moneys raised by general taxation levied for specific purposes, as for the construction of streets, bridges, sewers, or support of schools. The money so collected from the taxpayers by the city never belongs to the bondholders till it is actually paid over to them by the city. If the city should fail to pay it over, its contract with the bondholders, expressed in the bonds, would be broken, and the bondholders released from the limitation requiring them to await the accumulation of moneys in a particular fund to be so raised by taxes for the payment of the city's indebtedness on the bonds. The proposed mortgage of the waterworks to secure the payment of the bonds emphasizes the fact that the city is indebted in the amount of the bonds by such pledge of the city's property for their payment. A mortgage which is to be discharged by the payment of money secures an indebtedness, and cannot exist without the existence of a debt. Even if the creditor's remedy is limited by the contract to the property of the debtor which is cov-

ered by the mortgage, the relation of the debtor and creditor exists, and the debtor pays the debt when his mortgaged property is converted into money to discharge it, just as certainly as if, in the absence of any mortgage, his same property were sold under execution for the same purpose.

Appellant's contention amounts to this: That, notwithstanding the constitutional limitation referred to, and that the city, being already indebted beyond that limit, has no power, even with legislative sanction, to incur any new indebtedness to the amount of a single dollar, it may nevertheless borrow money to the extent of $400,000, issuing its negotiable bonds therefor, with interest, contracting to pay the same at specified dates, and that this will not create any indebtedness, if it shall at the same time levy taxes to be collected annually from the taxable property of the city for a long term of years, or indefinitely till the sum borrowed is paid therefrom, and provide that the bonds shall only be paid from the taxes so specially levied. If this may be done to build waterworks, the city may go on, and in the same way borrow and issue its bonds for an equal amount to build public buildings, and for another equal amount to construct a system of sewers, and for another equal amount to construct modern schoolhouses, and an unlimited amount as bonus to some railroad, taking care in each case to levy once for all a sufficient annual tax to meet the maturing bonds; and, though the property of the taxpayers may be thus practically confiscated, by being loaded down with taxes beyond any income which the property can produce, and for periods beyond any expectation of life which the taxpayers can indulge in, still those taxpayers, while groaning under such special levies, fixed upon them and extending hopelessly into the future, will have the happiness and satisfaction of knowing that they live in a city which has no municipal indebtedness large enough to cause uneasiness.

The fact that these proposed bonds are to bear interest at 4½ per cent. cannot be overlooked. Why should the city pay interest—that constant, distinguishing, most irksome, and disagreeable feature of indebtedness—upon money which it does not owe; money which belonged to it before it was received; being only its own fixed revenues, gotten hold of for present use, a little in advance, by "anticipation," and in no wise by incurring indebtedness? Up to the time when the circuit court granted in this suit the injunctions which are the subjects of these appeals, there was no decision of the supreme court of Iowa adjudging that a city could issue and negotiate bonds like the proposed issue under consideration, without creating any indebtedness, by merely making such bonds payable only out of the proceeds of a special tax at the same time levied on the taxable property of the city, and payable yearly, during a long term, by the taxpayers of the whole city, like all other taxes. The cases in that state bearing on the subject were all reviewed in Windsor v. City of Des Moines, 110 Iowa, 175, 81 N. W. 476, 80 Am. St. Rep. 280, and it must be admitted that there are loose dicta of judges in some of them which tend in that direction. In other states having like constitutional provisions such attempted evasion of the constitution has not generally

been sustained. Prince v. City of Quincy (Ill.) 21 N. E. 768; City of Joliet v. Alexander (Ill.) 62 N. E. 861; Earles v. Wells (Wis.) 68 N. W. 964, 59 Am. St. Rep. 886; Brown v. City of Corry (Pa.) 34 Atl. 854. But the supreme court of Iowa, in Swanson v. City of Ottumwa, 91 N. W. 1048, by its decision filed October 25, 1902, since the hearing of this cause in this court, sustains in full the contention of the appellant in this cause; holding that the proposed issue of bonds by said city to the amount of $400,000 will not, for the reasons urged by appellant, and fully stated above, create any indebtedness against the city of Ottumwa. This decision does not rest upon any peculiar construction of the constitution or statutes of Iowa. It holds in terms, as we do, that the provision of the Iowa constitution absolutely prohibits municipalities from contracting indebtedness in any manner or for any purpose in excess of the 5 per cent. limit. And we agree with its holding that the Iowa statutes authorizing cities to levy a continuing two-mill sinking fund tax for the purchase or erection of waterworks, and to pledge the proceeds of such tax and the net revenues to be derived from the waterworks, and the surplus of the annual tax not exceeding 5 mills, to meet operating expenses, to the payment of the purchase price or cost of construction of such works, and satisfaction of any bonds or mortgage for the security of such payment, and by contract restricting payments to moneys produced from such revenues, are constitutional; as, consistently with the constitution, they will apply to municipalities which are not indebted, or where the indebtedness to be incurred for such waterworks will not increase the total indebtedness of the municipality beyond the 5 per cent. limit. There is nothing on the face of these statutory provisions which can stamp them as a legislative evasion of the constitutional limitation in respect to municipal indebtedness. And it must be held that such statutory powers can only be exercised in cases where their exercise will not conflict with any constitutional restriction. The Iowa supreme court, after referring to these statutes, quotes the constitutional limitation above set forth, and very justly adds:

"The statute we have under consideration does not in terms or by necessary implication provide for the creation of any indebtedness by a city in excess of the limit here named, and therefore cannot be said to be void for unconstitutionality."

To this statement we fully agree, and we concur entirely in the statement by that court of what is the vital and only question in the case, as follows:

"But the finding of the constitutionality of the statute does not necessarily imply the validity of all the contracts made thereunder; for, if the obligation assumed by the city in such an enterprise is a 'debt' within the meaning of the constitution, it is valid only when such debt is within the 5 per cent. limit. Here we have indicated the vital question in the case before us. Does the contract create an indebtedness against the city? If answered in the affirmative, the judgment of the trial court is right, and must be affirmed; but, if answered in the negative, the judgment should be reversed, and the injunction dismissed."

This question,—whether the proposed contract of the city for the construction of waterworks to be owned by it, and the issue and

sale of its bonds to borrow nearly $400,000 to pay for such construc-
tion, will create an indebtedness against the city,—if not answered
by its bare statement, must be solved by reference to the law ap-
plicable to contracts in general, and to negotiable bonds in particular.
And while we agree with the Iowa supreme court in its construction
of its constitution and statutes, we are not bound by the opinion of
that court that the proposed contract and issue of bonds will not
violate the provisions of the constitution thus construed. What is
said by Judge Thayer in the recent case of Casserleigh v. Wood, 119
Fed. 308, is pertinent here:

"But we are of opinion that, when it becomes necessary to apply the statute,
as thus construed by the local courts, to a particular contract, and determine,
upon a consideration of all its provisions, whether it is a violation of the
statute, a federal court is entitled to express an independent judgment. In
the case last supposed the question to be determined is one of general law,
rather than of statutory construction, and the decision of the federal court
thereon ought to be something more than a mere echo of a previous decision
of the same question by a court of co-ordinate jurisdiction, although such a
decision is entitled to the highest respect, and should be regarded as per-
suasive authority."

We have examined carefully the opinion in Swanson v. City of
Ottumwa and the cases which are supposed to give support to its
conclusions. It will not be profitable to review in detail the reason-
ing employed to reach the result arrived at. To our minds it is not
persuasive, and we decline to be guided by it. Its citations exhibit
the unceasing attempts in that state and some others to nullify and
evade wholesome constitutional limitations upon the power of mu-
nicipalities to create indebtedness, and thus place intolerable burdens
on the taxpayers; and its reasoning but adopts the ingenious but
obviously untenable arguments by which such attempts have ever
been supported. In the case of Swanson v. City of Ottumwa the
supreme court of Iowa holds, in accord with the contention of the
appellant in this case, that the city of Ottumwa, though already
indebted beyond the constitutional limit, may now borrow $400,000
to construct waterworks by the issue and sale of its negotiable, in-
terest-bearing bonds to that amount, to be paid by taxation on the
taxable property of the city collectible year by year for 50 years,
and that the city will not thereby create any indebtedness if, at or
before the issuing of such bonds, it levies, once for all, this continu-
ous yearly tax, and bargains with the bondholders that the bonds are
to be paid only from the fund which shall be produced or accumu-
lated from the proceeds of this continuous yearly tax, with a vague
possibility of re-enforcement from a surplus of water rentals over
and above the cost of operating, maintaining, and extending the
waterworks. But the whole reasoning of the Iowa supreme court
drives it to this admission: That if the bondholders are not confined
to such provided fund, and have the right to go beyond that, and
under any circumstances require that the city shall in any future year
levy any tax to make payment on the bonds, then an indebtedness is
created by the issue and sale of the bonds, and the constitution vio-
lated. And that court overlooks or ignores the fact that future
taxation for the payment of the bonds under specified circumstances,

and if the provided fund shall happen to be in any year insufficient to pay the maturing principal and interest, is distinctly provided for by the ordinances and proposed contract under consideration, which provides that there shall be levied every year after the construction of the waterworks a water tax of five mills on the dollar, "or so much thereof as may be necessary, together with the net proceeds of the water rents, to pay the cost of maintenance, repairs," etc., "and to pay any of the purchase price or cost of constructing said works, or bonds or mortgages issued therefor, or interest thereon, which shall not be paid from the proceeds of the two-mill tax provided for in section two hereof." This quotation is from section 3 of ordinance No. 566, and will be found quoted at large near the beginning of the opinion of Judge Weaver in the Iowa case. That ordinance is the one which levies the continuing two-mill tax, and contains the whole contract between the city and the bondholders in respect to the issue and payment of the proposed bonds. Is it not perfectly clear, under the clause of section 3 above quoted, that, if in any year a water tax of only one mill shall be needed, together with the net proceeds of the water rents, to pay the cost of maintenance, repairs, etc., and at the same time there is matured and due principal and interest of the bonds in excess of what can be paid from the proceeds of the two-mill continuing tax, and enough to require the levy of the other four mills of water tax to discharge the same, the council must for that year levy that four mills for that very purpose? And, should the council refuse to make such levy, the bondholders might coerce them by mandamus. Therefore, if there were any sense or reason in the doctrine that the borrowing of money by a municipality in anticipation of a special fund, to be collected year by year from a continued tax, from which fund alone the borrowed money is to be paid, does not create an indebtedness, it is apparent that such a case is not presented here. In our judgment, the proposed bonds, if issued, will create an indebtedness against the city of Ottumwa, wholly in violation of the constitution of the state of Iowa.

The orders appealed from are affirmed, with costs.

NOTE. The following is the opinion of the circuit court on granting the first preliminary injunction (July 31, 1901), by McPHERSON, District Judge:

The complainant, a citizen of Maine, has filed its bill in equity against the respondent, a citizen of Iowa, a municipal corporation, and a city of the first class under the laws of Iowa.

1. The jurisdiction of this court is challenged by demurrer on the ground that the amount in controversy does not exceed $2,000 in amount or value. It is not denied but that the allegations of the bill are in the language of the statute, and in conformity to the forms recognized by all of the courts and the profession. A plea in abatement has also been filed, subject to the demurrer, by which it is claimed that the jurisdictional amount is not in controversy. Complainant is the owner of much property in, and a taxpayer of, the defendant city. Its annual taxes for several years past has been about, but a little less than, $2,000; and for this reason the city insists that the amount in controversy is too small to confer jurisdiction. But the bill alleges that the city is about to enter into an illegal contract involving the creation of an illegal debt of about $400,000, of which illegal debt the complainant, if it does not obtain relief in this action, will be required to pay many times $2,000. And I believe, and so hold, that, both because of the amount of

the debt that complainant will be required to pay and because of the amount of the alleged illegal debt, the court has jurisdiction.

2. The Iowa constitution, among other things, provides (section 3, art. 11): "No county or other political or municipal corporation shall be allowed to become indebted in any manner, or for any purpose, to an amount in aggregate exceeding five per centum on the value of the taxable property within such county or corporation, to be ascertained by the last state and county tax lists, previous to the incurring of such indebtedness." The bill alleges that the last state and county tax list shows that in the city there is $2,394,890 of taxable property, five per centum of which is, in round numbers, $120,000. After allowing for all cash on hand, the present indebtedness of the city is a little in excess of this constitutional amount, besides quite large sums which may or may not be valid items of indebtedness, as the proofs may be considered, but which I do not determine, because, without reference to them, the indebtedness not controverted equals that allowed by the constitution, and will be very largely exceeded if the proposed contract sought to be enjoined, if consummated, will create an indebtedness within the meaning of the constitution. It appears that complainant is the owner of and now operates a system of waterworks in defendant city. Evidence as to the manner in which complainant has its waterworks has been presented by both parties. Those matters are not determined. The city council of the defendant city, August 21, 1899, adopted an ordinance No. 566. Section 1 is to the effect that the city elects to erect or purchase a system of waterworks under chapter 5, tit. 5, Code 1897, Laws Iowa. Section 2 provides that for the year 1899 there shall be levied on all the property within the city, excepting lots greater than ten acres in area, used for agricultural and horticultural purposes, a tax of two mills on the dollar. The proceeds of such tax levy for the year 1899, and all subsequent years until the contract or purchase price of the system is paid for, shall be used to create a sinking fund to pay for such system of waterworks. Section 3 provides for a levy of five mills on the dollar on all taxable property within the limits of the benefit and protection of the waterworks to be constructed. The proceeds of the five-mill levy shall, with the rentals of private consumers, be used for expenses, and the excess, if any, shall go into said sinking fund. Section 4 is with reference to a proposed purchase of complainant's property, which is not material to this discussion. Section 5 provides that the engineer shall provide estimates and plans for the proposed system, the making of the contract for the construction, and a vote of the people to affirm or reject such contract. Section 6, as amended, provides for the issuance and sale of sufficient bonds of the city to raise funds with which to pay for the construction of the system. The bonds will bear interest at 4½ per cent., payable semiannually. At the end of two years, $5,000 of the bonds are payable, and a like sum annually thereafter for twenty-two years. Then the remaining bonds are to be refunded for a term not exceeding fifty years, making $10,000 payable annually. The bonds must be sold at not less than par. The proceeds from all the bonds are to constitute a trust fund with which to pay for and construct the works. Section 7 provides that no part, principal or interest, of the bonds, shall be paid out of any fund, levy, or tax other than the five-mill and the two-mill levies aforesaid. During the argument I suggested that it was apparent to me that the bonds never could be paid without going to some other fund, provided the city should not increase in wealth. The answer was made by counsel for the city that the purchasers of the bonds must buy them with knowledge of this fact, and, if the levy would not pay them, they must remain unpaid. I do not recall that I ever before heard of threatened repudiation in advance of the sale of bonds. The bill alleges, and the proofs show, that the plans of the engineer and the specifications for the works show that they can be constructed for $318,262. It is further made to appear that bids were advertised for. One bid was made, and that at a price in round numbers more than $80,000 greater than the estimate of the engineer. On such bid a contract has been made. The people at an election are to vote for and against the proposition to carry out this contract. By a restraining order issued, the election has been delayed. The restraining order should not have prevented the election. The election would be the exercise

of political rights, and is so much like the assembling of the people that it should not be denied by the process of the court. But the right or power to issue practically $400,000 of bonds, to run half a century or more, bearing interest payable twice a year, is a question for the courts, and on application of a taxpayer a court must decide for or against the validity of such proposed bonds. If the proposition is voted in the affirmative by the people, then the bonds may, and will no doubt, be quickly issued, unless restrained by the court. The bonds will, no doubt, be negotiable in form. Innocent purchasers may procure them. Therefore, if this is the creation of an illegal indebtedness, the danger is imminent, and this becomes a proper case for a court of equity. Therefore the question to be decided is, will this contract, if consummated, and the bonds issued, create an indebtedness?

A great many cases have been cited by counsel, which I am asked to consider. With satisfaction to myself, I can omit particular mention of many of the cases cited by making a few suggestions. A great many of those cases relate to special assessments. In all such cases the burden is borne by the property adjacent to the improvement for which the expenditure is made. This is on the theory, now too well established to controvert, that the adjacent property is benefited and enhanced in value equal to the tax or special assessment; and, this being so, the adjacent owners must pay for the improvement. Now, it may be, and in some instances the facts are, that the municipality issues and its officers sign the bonds or evidence of debt. But such evidences of debt are paid off and discharged by money paid by the adjacent owners, and other taxpayers of the city pay no sum whatever. The city acts as agent or trustee in collecting the money from the adjacent owners and in discharging the evidences of debt issued by, and sometimes in the name of, the municipality. And this statement covers all that can be said of any of the special assessment cases cited from Iowa, as well as from other states. Such cases are not in point. They are not authorities on the question now being considered. It is true that excerpts can be taken from many of those opinions, and an argument be made therefrom. But it is taking dictum, instead of taking, as we ought, what the courts in fact decided. I concede that on this question excerpts and dictum can be taken from the many opinions which to some might seem as tending to support the contention of the city in this case. But such an argument is arguing in a circle, and, however, long the argument or the circle, one gets back to the starting point, which is the constitutional provision in question, "No city shall be allowed to become indebted in any manner or for any purpose." And a promise to pay a certain amount, with interest, within a fixed time, out of taxes taken from all the people, including those not benefited, would seem to most people to be a debt. A few of these special assessment cases are the following: Davis v. City of Des Moines, 71 Iowa, 500, 32 N. W. 470; City of Clinton v. Walliker, 98 Iowa, 655, 68 N. W. 431; Tuttle v. Polk, 92 Iowa, 433, 60 N. W. 733. And even on this question there is a conflict. Fowler v. City of Superior, 85 Wis. 411, 54 N. W. 800. But I do not care to review the cases on the question of special assessments.

The two gravel-road cases by the Indiana supreme court were cited to me on the hearing as being in point. But they are special assessment cases. The supreme court of Indiana decided the cases on the ground of special benefits equal to the taxation. Board v. Harrell, 46 N. E. 124; Board v. Reeves, 26 N. E. 995. There is another class of cases containing much dictum that was urged before me, but a class of cases entitled to no consideration in the determination of the case at bar. And they are the cases pertaining to current expenses, such as furnishing light or water. They create no debt, excepting as the light or water is furnished. They are the ordinary expenses of the city. A few of these cases only need be cited as illustrating all of them: Grant v. City of Davenport, 36 Iowa, 396; Creston Waterworks Co. v. City of Creston, 101 Iowa, 687, 70 N. W. 739. There are many cases like them. The courts have held that, when the city can pay for the water or light from year to year out of its current revenues, such contracts are valid; and then only when the water or light has in fact been furnished, and even on that question the cases are in conflict. In Iowa the cases sustain the validity of such contracts, even though the city is in debt up to the constitutional

limit. But the question here is whether the city of Ottumwa, being in debt up to the constitutional limit, can erect a system of waterworks of its own at an expense of $398,000, sell its bonds and raise the money with which to make payment, and then in turn pay off the bonds by levy and assessment on all the taxpayers. And on that question the defendant city, by its counsel, has not cited an authority holding such contracts valid. And, broad as the statement is, I do not believe such an authority can be found. Respondent's brief is full of citations. But when they are examined—and I have examined them all—it will be found that they are as follows, without exception: (a) Dictum. Language from opinions which sustains the contention of the counsel for the city. But the dictum is very different from the question in fact decided by the judgment of the court. (b) Special assessment cases, where the city issues the evidence of debt, but where such evidence was to be discharged by the owners of property benefited, and the taxpayers generally did not contribute. And the two Indiana gravel-road cases are no exception. Nor are the two cases from the state of Washington exceptions. Winston v. City of Spokane, 41 Pac. 888; Faulkner v. City of Seattle, 53 Pac. 365. In those cases the bonds were to be paid for only from the receipts of the waterworks. In all such cases, and in all special assessments, the city is only the agent or trustee to collect the money and pay it over; and the taxpayers generally do not contribute to the payment. (c) Current expenses, such as annual rentals for fire hydrants, when the same is only to be paid for as the water is furnished, and when the same can be paid for out of the current revenues. On this proposition, according to the Iowa cases, the argument of defendant's counsel is sound. But we have no such case here. On the question here presented the cases without conflict, as I read them, hold that the city, when in debt to the constitutional limit, cannot make a valid contract for the erection of some work or improvement with the promise to pay therefor in the future. Such a promise is an indebtedness, and is an indebtedness in its entirety from the time the promises are made. And the constitutional provision in question is an inhibition upon both the legislature and the municipalities of Iowa, and was so intended. And, however shrewd or artful or plausible the proposed scheme may be, legislation by the state or action of the municipality will, when attempting to avoid the constitution, be overthrown by the courts. And to call a tax to pay off such contracts a special assessment or special levy is an attempt to argue the constitution to the winds, in order to succeed in a purpose for a supposed present necessity. And to argue that the project is a necessity is of no avail. The project may be of seeming absolute necessity; and it may be that every taxpayer but one favors the project, but that one taxpayer may resist it. This provision is found in the constitution of several of the states, and the supreme courts of such states have uniformly held as above stated. A few only of these cases I will cite:

In Iowa the latest case is Windsor v. City of Des Moines, 110 Iowa, 175, 81 N. W. 476, 80 Am. St. Rep. 280. In that case the contract was for the erection of an electric light plant. The contract was ingenious and plausible. The water rentals were pledged. The payments covered many years. All of the property of the plant was to be mortgaged to secure the bonds. The contract was held to be void, as seeking to create an indebtedness in addition to what the city was already indebted up to the constitutional limit. In Allen v. City of Davenport, 107 Iowa, 90, 77 N. W. 532, is a case where bonds were issued on account of street grading. The bonds were declared void, because they sought to create an indebtedness; and this in the face of the fact that the city would get the money, or the greater part of it, back from abutting owners. This is what the case decided. There is much dictum in the opinion to the effect as contended for by the city in the case at bar, and authorities are cited, which do not sustain the dictum. And the same is true of the Windsor Case above cited. Orvis v. Board, 88 Iowa, 674, 56 N. W. 294, 45 Am. St. Rep. 252: Here was a case with a scheme to make a park district the same in boundary lines as the city, and, making it a distinct corporation from the city, allow the issuance of bonds; and the scheme was much the same as in the case at bar, and the statute under which they were proceeding was much like the statute under

which the city in this case is acting. But it was held to be a scheme, and the indebtedness void. First Nat. Bank of Decorah v. District Tp. of Doon, 86 Iowa, 330, 53 N. W. 301, 41 Am. St. Rep. 489, was a case of bonds issued to refund some old indebtedness created beyond the constitutional limit. They were held void. French v. City of Burlington, 42 Iowa, 614: This was a case of street grading, and a part of the expenses were to be paid by the abutting owners and a part by the city. It was held to be a debt, and, being beyond the constitutional limit, held to be void. Mosher v. School Dist., 44 Iowa, 122: In this case the school district issued bonds to pay for a schoolhouse. The legislature provided that a lien should exist for materials furnished. Being in excess of the constitutional limit, the bonds and the indebtedness and proposed liens were held to be void. McPherson v. Foster, 43 Iowa, 48, 22 Am. Rep. 215, is a case like the Mosher Case, and with a like holding. I have not attempted to review these Iowa cases. I have attempted to state what was held in the several cases. In the opinions cited other cases are referred to. And the Iowa cases are uniform in such holdings.

In other states, with like constitutional provisions, we find similar holdings. But I will only refer to the cases. In Kentucky is the case of Beard v. City of Hopkinsville, 23 L. R. A. 402, and footnote (s. c. 95 Ky. 239, 24 S. W. 872, 44 Am. St. Rep. 222). City of Laporte v. Gamewell Fire-Alarm Tel. Co., 146 Ind. 466, 45 N. E. 591, 35 L. R. A. 686, 58 Am. St. Rep. 359. In West Virginia, in case of Spilman v. City of Parkersburg, 14 S. E. 282. In Illinois are the cases of Prince v. City of Quincy, 128 Ill. 443, 21 N. E. 768, and cases cited. In Pennsylvania, in case of Brown v. City of Corry, 175 Pa. 528, 34 Atl. 854. In Wisconsin, in case of Earles v. Wells, 94 Wis. 285, 68 N. W. 964, 59 Am. St. Rep. 886. And the supreme court, in the cases of District Tp. of Doon v. Cummins, 142 U. S. 366, 12 Sup. Ct. 220, 35 L. Ed. 1044, and cases cited. And no case, state or federal, has been called to my attention, and I know of none, that, in my opinion, is in conflict with any of the foregoing cases cited on this point.

The evil that existed, and which evil was corrected by the adoption of the constitutional provision, is known by all. If not so known, one has but to read the debates of the convention of 1857. He will find that many cities and counties in Eastern Iowa—the only part inhabited to a great extent—were in debt hopelessly. In some of those cities and counties the taxpayers are still struggling to pay for improvements, some of which were never constructed. But all such improvements were loudly contended for by the people, as they are at the present day. And the evil was successfully checked, if the courts will but stand by the constitution. But in the case at bar the argument seems to be that the city can go in debt more than the 5 per centum by calling it by some other name than "debt!" It is said that the ordinance provides, and the bonds will so recite, that the money will all be obtained by a "special assessment on all the taxpayers," and that only at the rate of two mills per year; and that, with the surplus of the five-mill levy, and the profits of private consumers, make the burden, not a debt, but a "special assessment." Ordinarily, "special assessments" mean the taxation of abutting property, such as is done for sidewalks, paving, etc. But a special levy of two mills on the dollar on all the property within the city, some of which may be one or more miles from a water main or hydrant, is not a "special assessment," and calling it such does not make it so. The constitution says, "No municipal corporation shall be allowed to become indebted in any manner, or for any purpose, more than five per centum on the last assessment," etc. The words "for any purpose" seems to me to cover a system of waterworks, and the words "any manner" are broad enough to cover "a two-mill levy." If those words do not so mean, then, as I believe, they are utterly without meaning or force. If the provisions can be ridden down by a two-mill levy, then a ten or twenty mill levy per year can be authorized each year for the erection of waterworks, and a like sum for an electric plant, and then for a city hall, and then for parks, and public bath houses, and libraries, and so on, until, under the pretense urged in this case, absolute confiscation can be authorized by the legislature, under the guise of taxation, in one year. But I do not say that the statute under which the ordinance was adopted is not constitutional. If the city were not in debt, and

the proposed improvement cost less than the 5 per cent., there would be no legal objection thereto. Or, if the money was raised in advance, the Iowa supreme court has held there can be no objection. Youngerman v. Murphy, 107 Iowa, 686, 76 N. W. 648. But that case does not conclude this point. It will be observed that the Allen Case, in the same volume, was decided at a later date. And there is no claim in the Youngerman Case that the general rule is overthrown. The validity of another section of the same statute, which provides that a system of waterworks so constructed may be governed by trustees appointed by the judges is now before the Iowa supreme court awaiting decision. The chances are that the court will not look with much favor upon a statute that either commands or allows judges to perform other than judicial duties, and takes from cities their rights of local self-government. Our constitution can be modified or amended by any one of three ways: An amendment can be submitted to the people by two successive legislatures. As to this provision, there has been no such amendment proposed. The legislature can call a constitutional convention. This has not been done. Under the constitution, the people must be asked at the general election every ten years if they want a change. The people have now four times—1870, 1880, 1890, and 1900—said they want no change. Can it not be said that the policy, in force for forty-four years, that the legislature is inhibited from allowing and the municipality from going into debt more than 5 per centum, is not now the settled policy of Iowa?

A temporary injunction will issue as prayed, excepting as against the election.